PRESTO-X-COMPANY, A NEBRASKA CORPORATION, APPELLANT, V. JOHN BELLER, APPELLEE.

568 N.W.2d 235

Filed August 29, 1997.   No. S-95-935.

Michael J. O'Bradovich for appellant.

Jeffery T. Peetz, of Milbourn, Fehringer, Kessler & Peetz, P.C., for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MCCORMACK, JJ.

STEPHAN, J.

Presto-X-Company brought this action against John Beller to enforce a covenant not to compete. The covenant was contained in a written agreement whereby Presto-X purchased the trade name, customer accounts, and goodwill of Beller's pest control business. Presto-X alleged that Beller violated the covenant and sought injunctive relief. Following a bench trial, the district court for Platte County found that the covenant not to compete was void and entered judgment for Beller. Because we conclude on de novo review that the covenant not to compete was unreasonably restrictive and, therefore, void, we affirm the judgment of the district court.

## FACTS

John Beller began his career in the pest control industry in 1977. After working as an employee for several pest control companies, Beller started his own pest control business in Columbus, Nebraska, in June 1988. The business was organized as a Nebraska corporation known as Beller Pest Control, Inc. Beller and his wife were officers, directors, and stockholders of the corporation. The company employed Beller and one other person who serviced accounts in the general vicinity of Columbus, Norfolk, Albion, Seward, Schuyler, Fullerton, and Fremont, Nebraska.

Presto-X-Company is a Nebraska corporation engaged in the pest control business. It was a direct competitor of Beller Pest Control. In 1990, discussions between Presto-X and Beller culminated in the sale of assets of Beller Pest Control to Presto-X. To effect this sale, the parties entered into an "Asset Purchase Agreement" (Agreement) dated September 24, 1990. This

Agreement provided that Presto-X would buy certain assets from Beller Pest Control described as: "a. Pest control service contracts, 'one-shots' and associated customer accounts; b. Goodwill with the right to use the Seller's trade name."

As a part of this transaction, Beller Pest Control provided Presto-X with a list of 81 customer accounts which were being transferred. Of the 81 customers, 10 were swine producers. Other assets of Beller Pest Control were specifically excluded from the Agreement, including cash and certificates of deposit, service vehicles, "[t]ermite control service contracts and termite control inspection accounts," and service equipment, supplies, and materials used by Beller Pest Control in its pest control business. At the same time as this transaction, Beller Pest Control sold a service vehicle and certain inventory and supplies to Presto-X under a separate agreement.

The Agreement contained the following provision:

P. COVENANT NOT TO COMPETE

1. The Seller [Beller Pest Control] agrees to refrain from any business activity, which would compete, directly or indirectly, with the business currently being sold by the Seller to the Purchaser [Presto-X], for a period of ten (10) years following the effective date of this Agreement, within one hundred (100) miles of the now-existing trade area serviced by the Seller, namely Columbus, Nebraska.

2. The Purchaser retains the right to enforce said non-competition agreement in any way allowed under the law, and has the option to sue for damages for violation of the non-competition agreement. This non-competition agreement is enforceable against the Seller, its assigns and successors.

3. Those covered by this non-competition agreement shall be the corporate entity itself, any shareholders, members of the Board of Directors or officers of the corporation.

The Agreement further provided that as of the closing date, "John Beller is bound by a non-competition agreement as are any other shareholders of the corporation and the corporation itself with the Purchaser set forth in paragraph P1 infra."

The Agreement recited a total purchase price of $45,000, with $18,000 payable at closing and the balance in six install-

ments of $4,500, each payable at 6-month intervals from April 1, 1991, to October 1, 1993. The Agreement allocated the purchase price as follows:

E. ALLOCATION OF PURCHASE PRICE AND RELATED PAYMENTS

    1. Non-Competition Agreement - $ 7,500.00

    2. Service Contracts -           33,340.00

    3. Interest -                 4,160.00

The Agreement further provided that it was to be governed by Nebraska law.

Following the asset sale, Beller was employed by Presto-X as a service technician in Columbus, Nebraska, from October 1, 1990, until December 22, 1992, when he resigned due to dissatisfaction with his employment. During his employment with Presto-X, Beller serviced some of the accounts which Beller Pest Control had transferred to Presto-X, as well as other Presto-X accounts in the Columbus area.

Immediately after leaving his employment with Presto-X, Beller started his own pest control business, which he initially operated as a sole proprietorship. He later incorporated the business as Pest Tech, Inc. As of the time of trial, Beller was the sole employee of Pest Tech, which performed "pest maintenance services" exclusively for the swine industry. Beller described these services as having two purposes: (1) to limit disease to livestock within confinement structures and (2) to prevent damage to the structures themselves.

Prior to the asset sale to Presto-X, Beller Pest Control provided structural pest management services to Sand Systems, a company which manages hog production facilities in the Columbus vicinity. After the asset sale, Presto-X assumed responsibility for this account. Sand Systems became dissatisfied with the service provided by Presto-X and eventually terminated the business relationship on February 8, 1993. Several months later, a representative of Sand Systems contacted Beller, who by that time had left his employment with Presto-X, and asked him to provide structural pest management services to Sand Systems. Beller agreed and entered into a contract with Sand Systems. James Pillen, the chief executive officer of Sand Systems from 1991 to 1993, testified that Sand Systems con-

tacted Beller for pest control because it did not have confidence in Presto-X and because Beller was the only person he knew who could give Sand Systems the help it needed.

Hastings Pork is a hog production business with facilities in Clay and Adams Counties. In February 1994, Beller contacted Hastings Pork to solicit business on behalf of Pest Tech. This was a "cold call," in that Beller had never previously provided pest control services to Hastings Pork, either while in business for himself or as an employee of Presto-X. However, at the time of Beller's initial contact, Hastings Pork was using Presto-X for its pest control requirements. On March 10, 1994, Beller entered into an agreement with Hastings Pork to provide structural pest control services, and Hastings Pork terminated its business relationship with Presto-X on the same day. Beller testified that the Hastings Pork facilities which he serviced were 102 to 105 miles from Columbus using the route he normally traveled.

Presto-X filed an action against Beller in the district court for Platte County, alleging that he breached the covenant not to compete contained in the Agreement. Presto-X sought temporary and permanent injunctive relief and an accounting for lost profits resulting from the alleged breach. It did not seek recovery of the portion of the purchase price which was allocated to the covenant not to compete. Following a bench trial, the district court entered judgment for Beller on June 28, 1995, which included a specific finding that "the covenant not to compete is void." Presto-X appealed this judgment to the Nebraska Court of Appeals, and we transferred the case to our docket pursuant to our power to regulate the caseloads of the Court of Appeals and this court.

## ASSIGNMENT OF ERROR

In its sole assignment of error, Presto-X contends that the district court erred in determining that the covenant not to compete contained in the Agreement was void.

## SCOPE OF REVIEW

An injunction is a form of equitable relief. See, *Omega Chem. Co. v. United Seeds*, 252 Neb. 137, 560 N.W.2d 820 (1997); *Robertson v. School Dist. No. 17*, 252 Neb. 103, 560

N.W.2d 469 (1997); *Sid Dillon Chevrolet v. Sullivan*, 251 Neb. 722, 559 N.W.2d 740 (1997).

In equity actions, an appellate court reviews the factual findings de novo on the record and reaches a conclusion independent of the findings of the trial court. *Robertson, supra*; *Friehe v. Schaad*, 249 Neb. 825, 545 N.W.2d 740 (1996). See, also, *Vlasin v. Len Johnson & Co.*, 235 Neb. 450, 455 N.W.2d 772 (1990).

## ANALYSIS

The sole issue in this case is whether the covenant not to compete which Presto-X seeks to enforce by injunction is void as a matter of law. Such covenants are utilized in contracts between the buyer and seller of a business and in employment contracts. In this case, Beller sold assets of a business which he had previously owned and operated to Presto-X and was then employed by Presto-X for approximately 27 months following the sale. The covenant which Presto-X seeks to enforce is contained in the contractual agreement pertaining to the sale of business assets; there is no evidence of any covenant not to compete arising from the employment relationship which existed subsequent to the sale. We, therefore, treat the covenant as one ancillary to the sale of a business.

The 1990 Agreement did not effect a transfer of real estate, tangible personal property, or other "hard assets." It was, essentially, the sale by Beller Pest Control of its trade name and its contractual rights with customers, including goodwill incident to its past business operations, in exchange for a cash payment by Presto-X. As we have previously noted, " '[c]ourts have generally been more willing to uphold promises to refrain from competition made in connection with sales of good will than those made in connection with contracts of employment.' " *CAE Vanguard, Inc. v. Newman*, 246 Neb. 334, 338, 518 N.W.2d 652, 655 (1994) (quoting Restatement (Second) of Contracts § 188, comment *b.* (1981)). Accord *Chambers-Dobson, Inc. v. Squier*, 238 Neb. 748, 472 N.W.2d 391 (1991).

Nebraska has recognized the legitimate need of one who purchases a business to reasonably protect himself against competition from the seller. In *Swingle & Co. v. Reynolds*, 140 Neb. 693, 695, 1 N.W.2d 307, 309 (1941), we stated that "the pur-

chase of the property and business of another furnishes a sufficient consideration for an agreement that the latter will not again engage in that business in the same vicinity" and that contractual restraints of this nature will not be considered unreasonable "when they are ancillary to any valid contract made in good faith and are apparently necessary to reasonably protect the parties, or either of them." We observed:

> It is almost intolerable that a person should be permitted to obtain money from another upon solemn agreement not to compete for a reasonable period within a restricted area, and then use the funds thus obtained to do the very thing the contract prohibits. Unless such contract be against the public interest, the parties should be held to their engagements.

*Id.* Applying these principles, we held that a contractual undertaking by the seller of a business that he would not engage in a similar business south of the Platte River for a period of 5 years after the sale was reasonable and, therefore, enforceable.

We addressed this issue again in *D. W. Trowbridge Ford, Inc. v. Galyen*, 200 Neb. 103, 262 N.W.2d 442 (1978), which involved an agreement by the seller of a Ford dealership in Holt County that he would not engage in the business of selling new cars in that county for a period of 15 years following the sale. Restating our holding in *Swingle & Co.*, we stated: "Partial restraints are not unreasonable if they are ancillary to a purchase of property made in good faith and are necessary to afford protection to the purchaser. What is a reasonable restraint depends largely upon the facts of the particular case." 200 Neb. at 105, 262 N.W.2d at 445. We concluded that the restraint at issue in that case, "which was limited as to both time and space, was reasonable." *Id.* at 106, 262 N.W.2d at 445.

*Chambers-Dobson, Inc., supra,* involved a covenant not to compete ancillary to the sale of an insurance agency, as well as a separate noncompetition covenant contained in an employment agreement subsequently entered into between the buyer and seller. With regard to the covenant ancillary to the sale, we cited the rules set forth in *Swingle & Co., supra,* and *D. W. Trowbridge Ford, Inc., supra,* and quoted with approval the following statement from Corbin on Contracts:

"The restraint of trade that is permissible [in connection with the sale of goodwill as a business asset] is no greater than is necessary to attain the desired purpose—the purpose of making good will a transferable asset. It is lawful for the seller to restrict his own freedom of trade only so far as is necessary to protect the buyer in the enjoyment of the good will for which he pays. The restraint on his own freedom must be reasonable in character and in extent of space and time."

238 Neb. at 755, 472 N.W.2d at 397 (quoting 6A Arthur L. Corbin, Corbin on Contracts § 1385 (1962)). We further found that such a contract is binding unless it contravenes the public interest. Regarding the public interest, we held in *Swingle & Co.*, 140 Neb. at 696, 1 N.W.2d at 309, that

[t]he elimination of one competitor from a restricted area for a limited time in the business field . . . does not appear to us to constitute such a restraint of trade or tendency toward monopoly incompatible with the public interest as to warrant one of the parties to avoid his solemn agreement . . . .

In *Chambers-Dobson, Inc.*, the covenant contained in the sale agreement had no geographic limitations, but did prohibit business contacts with 39 specific customers who were identified in the asset sale agreement. Because this "customer list" was specifically included in the assets being sold, we held that the covenant not to compete was a reasonable method of protecting the property acquired by the purchaser. We further held that the covenant contained in the sale agreement was not incompatible with the public interest or against public policy.

In the present case, we cannot conclude from the record that the covenant not to compete was injurious to the public interest. We, therefore, focus our inquiry on whether the covenant protected a legitimate business interest and, if so, whether the restraint on competition imposed by the covenant was "no greater than necessary" to attain its purpose. Presto-X had a legitimate business interest in the protection of the assets it purchased, including the goodwill associated with specific customer accounts. The use of a covenant not to compete was a reasonable means to protect the value of the assets purchased.

However, while a covenant not to compete ancillary to the sale of a business may be utilized to make goodwill a transferable asset, the restraint contained in the covenant must be reasonable in both space and time so that it will be no greater than necessary to achieve its legitimate purpose. See, *Chambers-Dobson, Inc. v. Squier*, 238 Neb. 748, 472 N.W.2d 391 (1991); *D. W. Trowbridge Ford, Inc. v. Galyen*, 200 Neb. 103, 262 N.W.2d 442 (1978); *Swingle & Co. v. Reynolds*, 140 Neb. 693, 1 N.W.2d 307 (1941).

Whether a covenant not to compete is reasonable with respect to its duration and scope is dependent upon the facts of each particular case. See *D. W. Trowbridge Ford, Inc., supra.* The fact that this court and others have upheld a covenant not to compete with a duration of 10 years or more does not automatically lead us to the conclusion that the 10-year restraint contained in the covenant at issue in the instant case was reasonable. Rather, we must look to the record for evidence which establishes that a 10-year restraint was a reasonable and necessary means of protecting the legitimate business interest of Presto-X.

We find no such evidence in the record. No witness testified as to reasons why Presto-X needed a 10-year restraint on competition from Beller in order to protect the goodwill which it purchased from Beller Pest Control. Although Presto-X argues that 10 years is an "industry standard" for a covenant not to compete ancillary to the sale of a pest control business, there is no evidence in the record to support this argument. Indeed, the only evidence suggestive of an "industry standard" is the testimony of Edward Pulien, a former owner of Cornhusker Fumigation, that when he and his partner sold their Nebraska pest control business in 1994, he executed a covenant not to compete with a 5-year duration which restrained him only from contacting his former customers whose accounts were transferred to the purchaser of the business. In *Chambers-Dobson, Inc.*, we noted that the duration of the restraint was reasonable in light of evidence that the acknowledged and accepted "useful life" of the sold customer list was 7 years. The record in the instant case contains no similar evidence to justify the duration of the restraint. Therefore, we find that the 10-year restriction

on competition imposed by the covenant not to compete is greater in duration than reasonably necessary to protect the value of the goodwill purchased by Presto-X from Beller Pest Control.

Likewise, the record does not establish that the covenant not to compete was reasonable in scope. The Agreement defines the scope as "one hundred (100) miles of the now-existing trade area serviced by the Seller, namely, Columbus, Nebraska." Presto-X contended at trial and on appeal that this provision restricted Beller from competing with Presto-X within a 100-mile radius of any point within the trade area which he served prior to the sale. Because Beller serviced accounts in Columbus, Norfolk, Albion, Seward, Fullerton, Schuyler, and Fremont prior to the sale, Presto-X contends that Beller is precluded by the covenant from engaging in the pest control business within a 100-mile radius of each of those communities. While there may be a plausible basis for restricting competition within the trade area actually served by Beller Pest Control, the record reflects no reason why Presto-X needed to restrain competition 100 miles away from each location within the trade area in order to protect the value of the assets which it purchased.

In *Chambers-Dobson, Inc., supra*, the scope of the restraint upon competition by the seller of business was defined by the specific accounts which were being transferred, rather than in geographic terms. The seller of the insurance agency was restricted from soliciting insurance business from specific customers identified in the asset purchase agreement with whom he had previously had a personal business relationship. We upheld the reasonableness of this restriction, stating: "The absence of specified geographic applicability of the noncompetition covenants presents no problem under the circumstances inasmuch as [the seller] can conduct an insurance agency in Lincoln or any other location, provided that he does not draw customers from the pools prohibited by the covenants." 238 Neb. at 763-64, 472 N.W.2d at 402.

We have narrowly defined the permissible scope of covenants not to compete contained in employment agreements to include only this form of "customer specific" restraint. For example, in *Polly v. Ray D. Hilderman & Co.*, 225 Neb. 662,

668, 407 N.W.2d 751, 756 (1987), we held that a covenant not to compete in an employment agreement "may be valid *only* if it restricts the former employee from working for or soliciting the former employer's clients or accounts with whom the former employee actually did business and has personal contact." (Emphasis supplied.) See, also, *Boisen v. Petersen Flying Serv.*, 222 Neb. 239, 383 N.W.2d 29 (1986) (holding that covenant not to compete was unreasonable and unenforceable in part because employee had no personal and business-based contact with employer's customers or prospective customers).

We do not define the permissible scope of a covenant not to compete ancillary to the sale of a business this narrowly. Even where such a sale involves a list of specifically identified customers, as in this case, there may be legitimate reasons why the purchaser must also restrict the seller from competing in a reasonably defined geographic area in order to protect the benefit of his bargain. However, such reasons must be shown in order to establish the reasonableness of a geographic restriction. As we have noted, there is no evidence in the record of this case to support the contention that Beller must be restrained from competing in areas up to 100 miles from the trade area which he served prior to the sale in order to protect the value of the goodwill and trade name purchased by Presto-X.

On the basis of our de novo review, we conclude that the scope and duration of the restraint on competition imposed by the covenant not to compete ancillary to the sale of Beller's business was greater than reasonably necessary to protect the legitimate business interests of Presto-X. Therefore, the covenant is contrary to public policy and void. An unreasonable covenant not to compete is of no effect, and its scope cannot be judicially reformed in order to make it enforceable. See *CAE Vanguard, Inc. v. Newman*, 246 Neb. 334, 518 N.W.2d 652 (1994). We, therefore, affirm the judgment of the district court in favor of Beller.

AFFIRMED.

CAPORALE, J., not participating in the decision.